UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES LUCA,

           Plaintiff,                 Case No. 4:22-cv-11169
                                         Hon. Anthony P. Patti

v.

COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

_____/

## OPINION AND ORDER GRANTING THE COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT (ECF No. 41)

**A.**    **Background[1]**

    Plaintiff James Luca brought this action for discrimination, alleging

termination of his employment, failure to accommodate his disability, unequal

terms and conditions of his employment, retaliation, and several other acts.  (ECF

No. 1, PageID.5.)  Plaintiff alleges that the Social Security Administration's

(SSA's) conduct violated Title VII of the Civil Rights Act, the Age Discrimination

---

[1] This case is one of four lawsuits Mr. Luca has filed recently in this district against the Commissioner of Social Security.  *See Luca v. Kijakazi et al*, Case No. 4:22-cv-12001-SDK-APP (E.D. Mich.) (Sept. 29, 2023 judgment in favor of Defendant and against Plaintiff); *Luca v. Commissioner of Social Security*, Case No. 2:23-cv-11966-APP (E.D. Mich.) (discovery due Sept. 13, 2024, dispositive motion deadline Oct. 31, 2024); and, *Luca v. Social Security Administration*, Case No. 2:23-cv-12393-APP (E.D. Mich.) (discovery due Oct. 14, 2024, dispositive motion deadline Nov. 22, 2024).

in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and various other federal laws.  (*Id.*, PageID.4.)

On September 30, 2023, Judge Kumar issued an order granting in part and denying in part Defendants' motion to dismiss.  (ECF No. 38.)  The order dismissed Defendants McCrary and Bazzi and dismissed Plaintiff's claims under the Fifth and Fourteenth Amendments, the ADA, the FMLA, and the LMRA.  (ECF No. 38, PageID.384.)  Judge Kumar also dismissed Plaintiff's discrimination claims stemming from his removal of service, as well as any claim challenging the notice of overpayment.  (*Id.*)

Thus, after the September 30, 2023 order, the Commissioner is the only remaining Defendant, and the only surviving claims are those "stemming from the SSA's denial of [Plaintiff's] LWOP [(leave without pay)] and conversion of his previously approved absence from work to AWOL [(absence without leave)] and any claim that his removal from service was due to retaliation[.]"  (*Id.*)

## B.    Instant Motion

Although this case was originally assigned to Judge Kumar, the parties have since consented to my jurisdiction (ECF Nos. 51, 52).  Currently before the Court is the Commissioner's November 7, 2023 motion for summary judgment (ECF No. 41), as to which Plaintiff has filed a response (ECF No. 47), the Commissioner has filed a reply (ECF No. 48), and the parties submitted a joint statement of

unresolved issues (ECF No. 54).  On August 27, 2024, I conducted a hearing, at which Plaintiff appeared *pro se* and Assistant U.S. Attorney Priya Kanwalgul Khangura appeared for Defendant.  (ECF No. 53.)  Following oral argument, the Court took the matter under advisement.

## C.  Standard[2]

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the

---

[2] At the outset of the hearing, the Commissioner agreed that the Court should apply a normal, Fed. R. Civ. P. 56 summary judgment standard, rather than the deferential standard applied to an appeal of an administrative decision.

motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted). Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (internal quotations and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a

4

showing sufficient to establish an essential element of its case. . . ." *Stansberry*,

651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56.

Rather, "liberal treatment of pro se pleadings does not require lenient treatment of

substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir.

2006). In addition, "[o]nce a case has progressed to the summary judgment stage, .

. . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S.

506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of*

*Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)

(quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.

2004)). The Sixth Circuit has made clear that, when opposing summary judgment,

a party cannot rely on allegations or denials in unsworn filings and that a party's

"status as a pro se litigant does not alter [this] duty on a summary judgment

motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010);

*see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming

grant of summary judgment against a pro se plaintiff because he "failed to present

any evidence to defeat the government's motion").

**D.    Discussion**

**1.    AFGE Collective Bargaining Agreement (CBA) & the SSA's
        Personnel Policy Manual (PPM)**

In his pleading, Plaintiff references both a collective bargaining agreement (CBA) and a personnel policy manual (PPM).  (*See*, *e.g.*, ECF No. 1, ¶¶ 6, 20.)  As for the CBA, a National Agreement between the American Federation of Government Employees (AFGE) and the SSA became effective on July 16, 2012.  (ECF No. 41-8, PageID.536.)  The CBA provides that "[a]n employee may request reasonable accommodation orally or in writing."  (ECF No. 1, PageID.27 ¶ C [Article 18].)  Article 31 governs time and leave (ECF No. 41-8, PageID.537-549), and Subsection 7, which concerns "leave without pay," provides, in part: "Employees have a right to LWOP consistent with government wide rules and regulations[,]" including "[w]hen an employee makes a request under the Family and Medical Leave Act, or the Expansion of the Family and Medical Leave Act and meets the criteria for that program."  (*Id*., PageID.545-546 ¶ E; ECF No. 1, PageID.33 ¶ D; ECF No. 47-2, PageID.776 ¶ E.)  Section 11, which concerns "General Leave Policies and Practices," states that "[t]he Employer will provide employees with its written reasons for any denial of leave[,]" and "[l]eave will not be denied as a disciplinary measure."  (ECF No. 41-8, PageID.548-549 ¶¶ E, F; ECF No. 47-2, PageID.777-778 ¶¶ E, F; ECF No. 1, PageID.34 ¶¶ E, F.)

As for the PPM, the SSA's "leave policies" – "family and medical leave," "leave without pay," "annual leave," and "sick leave" – each acknowledge that "[c]ontract provisions take precedence over the PPM[,]" (*see* ECF No. 41-8,

PageID.510, 516, 521, 527).  (*See also* ECF No. 41, PageID.396 ¶ 10.)  Of

particular import to the matter at bar are:  (a) the PPM's section on "family and

medical leave," which provides that "[e]mployees may not be put on family and

medical leave unless they have *invoked* their entitlement to the leave[,]" and also

provides for "requesting medical certificates for serious health conditions[,]" (*id*.,

PageID.512-513; ECF No. 47-1, PageID.731-732); and, (b) the PPM's section on

LWOP, which explains that "[t]here is no entitlement to LWOP except in [certain]

situations[,]" including the FMLA (ECF No. 41-8, PageID.516).

### 2. Timeline of Diagnosis and Requests for Leave

Plaintiff alleges his disability (or perceived disability) is coronary arterial

disease (CAD).  (ECF No. 1, PageID.5.)  He was diagnosed with CAD in 2014.

(ECF No. 41-13, PageID.615; ECF No. 41, PageID.404-405 ¶¶ 32-33.)

Incidentally, progress notes dated December 12, 2014 indicate that Plaintiff

"continues to be noncompliant with his medications despite my recommendations

and explanation for the importance of medical therapy."  (ECF No. 41-14,

PageID.620.)

### a. In 2016, Plaintiff requests leave via letters.

On April 19, 2016, Plaintiff signed a temporary promotion statement of

understanding, effective May 1, 2016 but not to exceed August 27, 2016, changing

his position from customer service representative to claims specialist.  (ECF No.

7

41-4.)  On May 9, 2016, approximately one week after Plaintiff's temporary position became effective, and unbeknownst to the SSA, Plaintiff accepted an Account Manager position with Diamond Electric United States (DEUS) outside of his government employment.  (ECF No. 41-7.)

Three days later, on May 12, 2016, Plaintiff (in writing to SSA Assistant District Manager (ADM) Martin) requested "leave because of a serious health condition" through August 15, 2026 and submitted a doctor's note from Joel K. Kahn, M.D., who wrote a note on what appears to be a prescription pad, the entirety of which states: "Mr. Luca is under my care for a serious cardiac condition.  Reporting to work is inadvisable from [May 16, 2016] for 12 weeks." (ECF No. 41-6, PageID.495.)  It appears Plaintiff's effective start date with DEUS was May 16, 2016 – *i.e.*, the day on which Dr. Kahn said it would be "inadvisable" to report to work.  (*See id.;* ECF No. 47-2, PageID.765-766, 770; ECF No. 47-3, PageID.793, 799.)

On or about July 18, 2016, Plaintiff wrote to ADM Martin, requesting to be "advanced sick from July 1st thru August 12 (30 work days) to cover the period before [his] anticipated return date[,]" and, "[i]f advanced sick leave is unavailable," then requesting "leave without pay (LWOP)."  (ECF No. 41-6, PageID.496.)  Later in July 2016, Dr. Kahn wrote:  "Mr. Luca is under my care for serious cardiac disease.  Reporting to work is inadvisable from today for 6

months[.]"  (ECF No. 41-6 PageID.497.)  Plaintiff submitted Dr. Kahn's note to

ADM Martin on or about August 10, 2016.  (*Id*.)  According to SSA Assistant

Manager (AM) Bazzi, on August 11, 2016, Plaintiff called the Clawson office,

spoke with the ADM, and informed the ADM that his "cardiologist recommended

[he] go to rehabilitation before returning to work."  (ECF No. 41-5, PageID.479.)

Bazzi also characterized this as "inform[ing] management that [he] could not

return to work until [he] completed rehabilitation."  (*Id*., PageID.484.)

On September 26, 2016, Dr. Kahn wrote:  "Mr. Luca is under my care for serious

cardiac disease since March 2015.  Reporting for work is inadvisable for 6 months.

The condition is chronic[.]  He has cardia chest pain with work stress[.]  He is

unable to perform his work[.]"  (ECF No. 41-6, PageID.503.)  On October 19,

2016, AM Oussama Bazzi wrote to Plaintiff, "enclosing additional SSA-71's,

Application for Leave forms[,]" and asked Plaintiff to "complete all the fields and

return to [his] attention to allow [him] to process [Plaintiff's] FMLA request."

(ECF No. 41-6, PageID.505.)  Plaintiff's time and attendance (T&A) summary for

the pay period November 27, 2016 to December 10, 2016 notes that "[a]ll prior

leave requested and approved was granted with the understanding that EE

[employee] was unable to return to duty based on a serious medical condition."

(ECF No. 47-2, PageID.764.)

**b.    On February 16, 2017, Plaintiff completed an application for leave (SSA-71).**

On February 16, 2017, Dr. Kahn wrote:  "Mr. Luca has serious cardiac disease since March 2015.  The condition is chronic.  He has cardiac chest pain with work stress.  He is unable to perform his work for 6 months[.]"  (ECF No. 1-2, PageID.28; ECF No. 41-9, PageID.552; ECF No. 47-1, PageID.749, 751; ECF No. 47-2, PageID.762.)  On the same day, Plaintiff completed an Application for Leave (SSA-71), seeking LWOP through August 15 and purportedly attaching "medical certification . . . ."  (ECF No. 1-2, PageID.28; ECF No. 41-9, PageID.551-552, 556; ECF No. 47-1, PageID.748-749.)  On February 18, 2017, Plaintiff e-mailed Bazzi, requesting "approval of leave due to health reasons[,]" and attaching "the SSA-71 and medical certification."  (ECF No. 41-9, PageID.550.)

On February 21, 2017, Bazzi sought SSA employee Carlos Cisneros's "opinion regarding the leave request and medical documentation."  (ECF No. 47-1, PageID.750.)  On February 23, 2017, SSA District Manager (DM) Lisa McCrary emailed SSA Area Director (AD) Maurice El Amin, asking him to "deny [Plaintiff's] leave slip" and "return the signed slip" to her, so the SSA could "forward it back to him with accompanying FMLA paperwork."  (*Id*.)  It seems El Amin returned the slip to McCrary via email on February 27, 2017.  (ECF No. 47-1, PageID.752; *see also id.*, PageID.753.)

10

On February 27, 2017, El Amin disapproved Plaintiff's LWOP application

for leave.  (ECF No. 41-9, PageID.556; ECF No. 47-1, PageID.751.)  By a letter

dated February 28, 2017, Bazzi informed Plaintiff that his request for LWOP

through August 15, 2017 was denied.  (ECF No. 1, PageID.30; ECF No. 47-1,

PageID.754.)  The SSA's notice informed Plaintiff that he could elect to request

FMLA for his "extended leave of absence."  (*Id.*)

### c.    In March 2017, Plaintiff completes multiple applications for leave (SSA-71s).

On March 11, 2017, Plaintiff completed four applications for leave through

August 15 (SSA-71s), based on either sick leave, advanced sick leave,

administrative leave, or VLTP (voluntary leave transfer program).  (ECF No. 41-9,

PageID.558, 559, 563.)  Bazzi disapproved the Administrative Leave and VLTP

requests on March 14, 2017, seemingly because Plaintiff's circumstances did not

meet the law and regulations for administrative leave and, as to VLTP, he needed

to submit form SSA-3136 and medical certification.  (ECF No. 41-9, PageID.563.)

Also on March 14, 2017, Bazzi informed Carlos Cisneros (SSA) that Plaintiff

"never submitted the request SSA-71 for FMLA[,]" and that "the only request

received and approved was LWOP."  (ECF No. 47-2, PageID.755.)  That same

day, Bazzi wrote to Plaintiff, referring him to the PPM's Family and Medical

Leave chapter (S630-4) regarding "Requesting Medical Certificates for Serious

Health Conditions" (Section 3.7).  (ECF No. 47-2, PageID.756-757.)  (*See also* ECF No. 41-8, PageID.513.)

### d.    Plaintiff has an initial interview with the Equal Employment Opportunity Commission (EEOC).

On March 16, 2017, Plaintiff contacted and had an "initial interview" with an EEO counselor.  (ECF No. 41, PageID.407 ¶ 39; ECF No. 41-16, PageID.631-633, 635 [CHI-17-0464].)  On March 17, 2021, Plaintiff completed another two applications for leave (SSA-71s) to August 15 – one for LWOP and another for AWOL, each "under FMLA" and referring to "medical certification on file."  (ECF No. 41-9, PageID.566, 570; ECF No. 47-2, PageID.759.)  On March 23, 2017, Bazzi:  (i) disapproved Plaintiff's application for AWOL, seemingly because it is "not a leave category[,]" (*id.*); (ii) wrote to Dr. Kahn, requesting verification of the authenticity of the medical certificates, which Dr. Kahn authenticated on March 27, 2017 (ECF No. 47-2, PageID.760-761); and, (iii) wrote to Plaintiff, explaining that, "[i]n order for a determination to be made on your most recent leave request dated [March 17, 2017], you will need to submit an amended request due to a conflict in dates and duration of your request, specifically the request period beginning [February 16, 2017]-[March 17, 2017][,]" (*id.*, PageID.763).  On March 29, 2017, Bazzi emailed Cisneros, attaching Dr. Khan's verification of the authenticity of the medical certification and informing Cisneros that he (Bazzi) would begin to charge AWOL.  (ECF No. 47-2, PageID.758.)

During the EEO's "informal counseling stage," an EEO counselor interviewed AD Maurice El Amin, DM McCrary, and ADM Bazzi.  (ECF No. 41, PageID.407 ¶ 39; ECF No. 41-16, PageID.639-641; ECF No. 47-1, PageID.747.)

### e.   The SSA's Office of the Inspector General (OIG) investigates.

By a March 21, 2017 subpoena duces tecum, Dr. Khan's office was commanded to appear before Special Agent Michael McHugh of the SSA's OIG on April 7, 2017 "in connection with an official investigation being conducted by the [SSA] . . . concerning the possible fraudulent or otherwise improper receipt of Social Security funds[,]" and to bring records and/or documents "for the period January 1, 2016 through the present[.]"  (ECF No. 47-3, PageID.800.)

According to Wayne County Sheriff's Department (WCSD) Detective Anthony Domek, on March 31, 2017, he and "RAC" Adam Lowder attempted to interview Plaintiff, interviewed two Diamond Electric employees, and interviewed Plaintiff's wife, Monique Luca.  (ECF No. 47-3, PageID.799.)  On the same day, Bazzi wrote to Plaintiff, stating that his "request to invoke entitlement under Leave Without Pay (LWOP) under the Family Medical Leave Act (FMLA) [was] approved effective March 27, 2017[,]" and he would "exhaust this entitlement on June 19, 2017."  (ECF No. 1-2, PageID.31; ECF No. 47-2, PageID.767.)

### f.    In April 2017, Plaintiff completes another application for leave (SSA-71).

On April 6, 2017, Plaintiff completed another application for leave (SSA-71), seeking LWOP for the period March 27 to August 15 and purportedly submitting medical certification.  (ECF No. 41-9, PageID.576; ECF No. 47-2, PageID.768.)  In a letter dated April 10, 2017, seemingly with reference to his April 6, 2017 application, Plaintiff stated, "*I do not invoke my entitlement to use LWOP under Family Medical Leave*[,]" referenced the CBA's Article 31 (Time & Leave) and the PPM's sections on FML (S630_4) & LWOP (S630_6) and noted that "AFGE provisions take precedence over PPM."  (ECF No. 41-9, PageID.576 (emphases added); ECF No. 47-2, PageID.768.)  In a letter dated April 10, 2017, Bazzi informed Plaintiff that his "leave request dated [April 6, 2017] requesting [LWOP] from [March 27 to August 15] is denied."  (ECF No. 41-9, PageID.578; ECF No. 47-2, PageID.769.)  The letter also explained that, *"[a]bsent your invocation of FMLA, there is no obligation placed upon management to grant LWOP*[,]" and he "will be charged [AWOL] from [March 27, 2017] continuing until you either return to work, or are approved for leave due to a subsequent request."  (*Id*. (emphasis added).)

### g.    The SSA converts Plaintiff's LWOP to AWOL.

In an April 13, 2017 memorandum, SA McHugh informed DM McCrary about the OIG's "investigative findings" – *e.g.*, regarding his employment at

14

DEUS – and asked her "to redetermine LUCA's leave requests for the period May 13, 2016 through the present." (ECF No. 47-2, PageID.770 (emphasis in original).) On or about April 17, 2017, Bazzi informed Plaintiff that "all previously approved leave beginning with May 2016 will be converted and charged to [AWOL][,]" and also explained that "AWOL itself is not discipline, but disciplinary action may result from any AWOL you incur." (ECF No. 1, PageID.32; ECF No. 41-10; ECF No. 47-2, PageID.771.)

### h.  Plaintiff submits a formal EEO complaint.

In late April 2017, Plaintiff submitted a formal EEO complaint of discrimination. (ECF No. 41-17 [Case No. CHI-17-0464]; ECF No. 1-3, PageID.46.) In June 2017 and July 2017, SSA officials provided affidavits in the EEO investigation. (*See* ECF No. 41-18, PageID.647-651 [DM McCrary]; ECF No. 41-18, PageID.652-658 & ECF No. 1-2, PageID.39 & ECF No. 47-1, PageID.728 [ADM Bazzi]; ECF No. 41-18, PageID.659-663 & ECF No. 47-1, PageID.727 [Retired AD El Amin].)

Meanwhile, on May 8, 2017, the SSA provided "notice of [Plaintiff's] indebtedness to the Agency[,]" referencing an exhibit, which provided a "detailed breakdown" and a "net to be paid by employee" in the amount of $14,644.03. (ECF No. 1-2, PageID.35-36.) On September 21, 2017, Bazzi issued a notice of proposed removal (AFGE). (ECF No. 41-5; ECF No. 47-2, PageID.765-766.) It

states, *inter alia*:  "LWOP may not be used to engage in outside employment[,]" citing SSA PPM Section 630.6.5.3.4 . . . ."  (ECF No. 41-5, PageID.483.)  (*See also* ECF No. 41-8, PageID.519.)[3]  ADM Bazzi also wrote that, "[i]n charging AWOL, I considered that you were previously informed on at least two separate occasions in the past five years that use of LWOP to engage in outside employment is inappropriate."  (ECF No. 41-5, PageID.483.)  Bazzi did not find believable Plaintiff's explanation that his "outside employment was 'low stress' and thus [his] cardiac condition was not aggravated by this outside work[,]" a conclusion he supported by, *inter alia*, describing Plaintiff's outside employment and explaining why he did not believe that Plaintiff's "failure to inform management of [his] outside employment was an oversight or innocent mistake." (*Id*., PageID.484; ECF No. 47-2, PageID.766.)  Ultimately, Bazzi proposed Plaintiff's "removal from the Federal service to promote the efficiency of the Federal service."  (*Id*., PageID.490.)

---

[3] Notwithstanding Detective Domek's supplementary incident report, triple hearsay which reflects that the United States "district attorney" communicated that the "SSA does not have a policy that specifically prohibits working on sick leave and does not require employees to request permission before obtaining outside employment[,]" (ECF No. 47-3, PageID.798), the PPM's section on LWOP (S630_6), Subsection 5.3.4, provides "examples of inappropriate usage," including "to engage in private or commercial work providing no value to SSA."  (ECF No. 41-8, PageID.519.)

On October 19, 2017 – in contrast to his previously generic references to Plaintiff's ability to work – Dr. Kahn wrote a somewhat more specific note:  "Mr. Luca is under my care since March 2015.  He has cardiac chest pain with work stress.  His condition is chronic.  He is unable to perform his work *at SSA* for 6 months[.]"  (ECF No. 47-3, PageID.772, 782 (emphasis added).)

      **i.**     **In November 2017, the SSA seeks Certification of Health Care Provider for Employee's Serious Health Condition (Form WH-380E), and Plaintiff challenges the proposal to remove.**

On November 14, 2017, Bazzi wrote to Plaintiff, noting:  "In order for me to make a determination on your most recent leave requests dated [November 9, 2017], requesting [LWOP] under FMLA from [November 13, 2017] through [December 8, 2017] and LWOP from [December 11, 2017] through [April 18, 2018], I am requesting the enclosed WH-380E form, Certification of Health Care Provider for Employee's Serious Health Condition, be completed and returned within fifteen (15) calendar days, by [November 29, 2017]."  (ECF No. 47-3, PageID.783.)

On November 16, 2017, Plaintiff challenged Bazzi's September 21, 2017 proposal to remove (AFGE).  (ECF No. 41-11.)  On November 28, 2017, Plaintiff wrote to Bazzi, with "questions and concerns regarding [the November 14, 2017] request for 'medical certification' and [the November 15, 2017] 'outside employment' questionnaire."  (ECF No. 47-3, PageID.788.)  On December 5,

17

2017, Bazzi wrote to Plaintiff regarding "FMLA/LWOP Requests," noting that, "[i]n order to process your request for FMLA, you must have your Medical Care Provider answer <u>all</u> of the questions in Section III of the WH-380E Form except Question #2, relating to pregnancy or possible pregnancy."  (ECF No. 47-3, PageID.784-785 (emphasis in original).)

> **j.     In December 2017, the SSA removed Plaintiff from federal service.**

Effective December 19, 2017, the SSA removed Plaintiff from federal service, because he "failed to obtain approved leave status for the majority of [his] continued leave of absence from May 13, 2016 to the present, resulting in charges of AWOL[,]" and "for conduct unbecoming of a federal employee."  (ECF No. 1-2, PageID.38; ECF No. 41-3; ECF No. 47-1, PageID.746.)  (*See also* ECF No. 41-12 [McCrary's December 19, 2017 Decision to Remove from Federal Service (AFGE)]; *see also* ECF No. 47-2, PageID.773-774.)

On July 27, 2018, the SSA denied Plaintiff's request for waiver of salary overpayments.  (ECF No. 47-3, PageID.791.)  Several months later, on December 12, 2018, Plaintiff was prescribed cardiac rehabilitation.  (ECF No. 1-2, PageID.26.)  On December 18, 2018 – one year after Plaintiff was removed from federal service – Dr. Kahn wrote:  "Mr. Luca has been under my care since March 2015 for a serious cardiac condition.  He is now able to return to work[.]"  (*Id.*,

PageID.29; ECF No. 47-3, PageID.786.)  (*See also* ECF No. 41-15 [Office Visit Notes]; ECF No. 47-2, PageID.779-781.)[4]

### k.    The EEOC issued decisions in 2021 and 2022.

On February 23, 2021, the EEOC granted summary judgment in favor of the Agency.  (ECF No. 1-2, PageID.40-41; ECF No. 41-19, PageID.664-670.)  On March 17, 2021, the Agency issued "a final order adopting the [administrative judge]'s finding of no discrimination."  (ECF No. 1-2, PageID.43.)  Plaintiff filed an appeal with the EEOC on April 16, 2021.  (*Id*., PageID.42.)  On or about October 18, 2021, the EEOC affirmed the Agency's "final order implementing the AJ's finding of no discrimination."  (*Id*., PageID.44, 46.)

On February 23, 2022, the EEOC denied Plaintiff's request for reconsideration.  (ECF No. 1-3, PageID.46-48.)  Shortly thereafter, the U.S. Department of the Treasury issued a notice of intent to initiate administrative wage garnishment proceedings.  (ECF No. 1-2, PageID.45 [Mar. 1, 2022].)

### 3.    Rehabilitation Act (29 U.S.C. §§ 701-796*l*)

"As a threshold matter in every disability-discrimination claim, a plaintiff must demonstrate that (1) she is disabled; and (2) she is 'otherwise qualified for the

---

[4] On January 4, 2019, DM McCrary wrote to Plaintiff, referring to the December 19, 2017 notice and informing him that, because he was "no longer an employee of this agency," he would "not be admitted to the office absent legitimate agency business unrelated to [his] prior employment."  (ECF No. 47-3, PageID.787.)

position despite' her disability, either with or without a reasonable

accommodation." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th

Cir. 2017) (citation omitted).

### a.    Is Plaintiff disabled under the Rehabilitation Act?

The Commissioner argues that Plaintiff "cannot establish he is disabled

under the Rehabilitation Act." (ECF No. 41, PageID.409-411.) "Disability"

means "a physical or mental impairment that constitutes or results in a substantial

impediment to employment[.]" 29 U.S.C. § 705(9)(A). "[T]o prove that he is

disabled, [Plaintiff] must show that he has (1) 'a physical or mental impairment

that substantially limits one or more major life activities,' (2) 'a record of such an

impairment,' or (3) '[is] regarded as having such an impairment[.]'" *Booth v.*

*Nissan N. Am., Inc.*, 927 F.3d 387, 393 (6th Cir. 2019) (quoting 42 U.S.C. §

12102(1)).

Upon consideration, the Court concludes that Plaintiff was not disabled

under the Rehabilitation Act. Plaintiff cites Bazzi's February 28, 2017 letter as

evidence that Plaintiff had established his CAD disability with the Commissioner

and had been "approved for LWOP beginning May 2016, until March 26, 2017[.]"

(ECF No. 47, PageID.708 (citing ECF No. 47-1, PageID.754).) However, "a

plaintiff who alleges a work-related disability is still required to show that her

impairment limits her ability to perform a class of jobs or broad range of jobs."

*Booth*, 927 F.3d at 394 (quotations and citations omitted).  To the extent Plaintiff

testified about stress in his SSA customer service position, in dealing with the

general public, or due to "constant contact with Mr. Bazzi . . . ," (*see* ECF No. 41-

2, PageID.442 [pp. 82-83], 446-447 [pp. 100-101]), EEOC regulations explain that

"a plaintiff cannot claim a disability by simply '[d]emonstrating a substantial

limitation in performing the unique aspects of a single specific job.'"  *Booth*, 927

F.3d at 394 (quoting 29 C.F.R. § 1630, App. (2016)).  And, "impairments that are

developed or exacerbated because of a particular supervisor or work environment

do not constitute a disability under the Act."  *Porter v. Sebelius*, 192 F. Supp. 3d 8,

16 (D.D.C. 2016) (citing *Klute v. Shinseki*, 840 F. Supp. 2d 209, 215-217 (D.D.C.

2012)).  Plaintiff has not established that his disability "prevented him from

working in a class or broad range of jobs" (ECF No. 41, PageID.410) just because

he characterizes his work at DEUS as, basically, "stress-fee, outside

employment[,]" (ECF No. 41-2, PageID.448 [p. 108]), and, further testified that, if

he felt stressed, he "can just remove [himself] from the situation[,]" unlike "the

public service job . . . [,]" (*id*., PageID.451 [p. 118]).  (*See also id*., PageID.449 [p.

110].)  The fact remains that his outside employment was full-time, involved

domestic and international travel, and involved communication with "outside

customers, usually buyers or engineers or plan managers."  (ECF No. 41-2,

PageID.449 [pp. 110-112].)  Indeed, at the hearing, Plaintiff explained he was

working in "account management" serving "three" customers.  Moreover, Plaintiff

testified he did not inform DEUS about his medical condition when he first started,

nor did he inform DEUS that he had requested leave from the SSA for a chronic

medical condition.  (*Id.*, PageID.450 [p. 116].)  Thus, Plaintiff has not shown

evidence of substantial limitation in one or more major life activities, as defined by

42 U.S.C. §§ 42 U.S.C. § 12102(1)(A), 42 U.S.C. § 12102(2).

Likewise, Plaintiff has not shown "record of such an impairment[.]"  42

U.S.C. § 12102(1)(B).  "An individual has a record of a disability if the individual

has a history of, or has been misclassified as having, a mental or physical

impairment that substantially limits one or more major life activities."  29 C.F.R. §

1630.2(k).  The Commissioner rightfully states that "Plaintiff's leave request and

accompanying doctor's notes do not suffice."  (ECF No. 48, PageID.802.)  Not

only are the doctor's notes quite general, but also, as already noted, Plaintiff has

not shown that his CAD substantially limits a major life activity.  *See Spence v.

Donahoe*, 515 F. App'x 561, 570 (6th Cir. 2013) ("the 'record of impairment'

prong . . . requires that a plaintiff at one point had (or was classified as having) an

impairment that substantially limited a major life activity.") (citing 29 C.F.R. §

1630.2(k)); *McNeill v. Wayne Cnty.*, 300 F. App'x 358, 361 (6th Cir. 2008)

("McNeill presents no concrete evidence that these conditions substantially limit

her major life activities.").

22

Finally, Plaintiff has not shown that he was "regarded as having such an impairment . . . ." 42 U.S.C. § 12102(3), 29 C. F. R. § 1630.2(l)(1). Citing El Amin's EEO undated and fragmented "affidavit" (ECF No. 47, PageID.727), Plaintiff contends he "was regarded as having a cardiovascular disability . . . ." (ECF No. 47, PageID.713.) However, Plaintiff "lacks evidence that the SSA's actions were based on a belief that he had a physical or mental impairment." (ECF No. 48, PageID.803.) *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) ("to state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations."). At the time the Commissioner denied or recharacterized Plaintiff's requests for LWOP and removed him from federal service, "the SSA did not regard Plaintiff as impaired or unable to work." (ECF No. 48, PageID.803.) *Khatri v. Ohio State Univ.*, No. 21-3193, 2022 WL 620147, at *3 (6th Cir. Jan. 25, 2022) ("Khatri did not allege any facts establishing a connection between the alleged perception of disability and any adverse employment action, and he passed the fitness-for-duty exam more than a year before his employment was terminated."), *cert. denied*, 143 S. Ct. 248 (2022). Instead, "management learned that Plaintiff was working full time at another job, contrary to his assertions that he was unable to work[,]" after which he was "removed for charges of AWOL and conduct unbecoming a federal employee—

23

not a perceived disability." (ECF No. 48, PageID.803.) Put another way, when the SSA granted Plaintiff leave, they may have perceived a disability, but, when they took the adverse action, he was not perceived as disabled. To the contrary, the undisputed records show that, based on his full-time, higher-paying, non-government work – involving travel to Europe and Asia – SSA perceived Plaintiff as relatively healthy, capable of customer-related work, and disingenuous as to his motivation for seeking leave. The undisputed evidentiary record shows that Defendant converted Plaintiff's LWOP to AWOL, and, ultimately, removed Plaintiff from federal service, not because he was perceived as being disabled, but for the very opposite reason: He was believed to have faked or grossly exaggerated his inability to work and the medical condition he identified as the reason. In fact, Plaintiff was asked at oral argument if it is his "understanding that per their investigation and the citations they gave you, that they regarded you as not suffering from a medical impairment or not being unable to work?" Plaintiff answered, "Yes, your Honor, they clearly state that."

### b. Was Plaintiff otherwise qualified for his position?

The Commissioner argues that, even if Plaintiff were disabled, "he was not otherwise qualified for his position." (ECF No. 41, PageID.411-412.) "An employee is deemed qualified only if she can perform all of the essential functions

of her job, whether accommodated or not." *Williams*, 847 F.3d at 391 (citing 42
U.S.C. § 12111(8)).

Arguing that he is "otherwise qualified for [the] position[,]" Plaintiff
attempts to distinguish *Williams*, contending he "was not terminated for job
abandonment or violation of leave policies." (ECF No. 47, PageID.709.) Instead,
citing the December 19, 2017 removal notice (*see* ECF No. 47-1, PageID.746),
Plaintiff contends he was "constructively terminated when the [Commissioner]
acted to retroactively change all previously approved LWOP to AWOL," resulting
in Plaintiff's "termination" for "failure to obtain approved leave." (ECF No. 47,
PageID.710.)[5] Then, citing the CBA's prohibition on denial of leave as a
disciplinary measure (ECF No. 47-2, PageID.778 ¶ F), as well as 29 C.F.R. §
1630.2(l)(1)'s prohibited actions, Plaintiff argues that the Commissioner's
conversion of LWOP to AWOL was a "punishment" that "made the approved
leave an ineffective accommodation[.]" (ECF No. 47, PageID.710, 713.) But the
record shows otherwise. SSA made clear that the retroactive conversion of LWOP
to AWOL was not a punishment; rather, it reflected the adjusted and proper
category for a person who refrained from government employment in order to

---

[5] The United States Office of Personnel Management has explained that, "*In
general* management should not retroactively charge AWOL if the employee was
granted the leave in the first place!" (ECF No. 1-2, PageID.37; ECF No. 47-3,
PageID.790 (emphasis added).)

work elsewhere (as opposed to doing so for valid and substantiated medical reasons) and who had clearly rejected "my entitlement to use LWOP under Family Medical Leave."  (ECF No. 1, PageID.32; ECF No. 41-10; ECF No. 47-2, PageID.771; ECF No. 41-9, PageID.576; ECF No. 47-2, PageID.768.)

Furthermore, Plaintiff's argument that the Commissioner is "liable for failing to provide a reasonable accommodation[,]" (*id*., PageID.713, 710), is unavailing.  Assuming, *arguendo*, that Plaintiff was "qualified for his position with the accommodation of leave," his "request for additional leave was unreasonable." (ECF No. 41, PageID.411.)  Plaintiff considered his SSA-71s as "requests for reasonable accommodation under the SSA's reasonable accommodation policy." (ECF No. 41-2, PageID.467 [p. 182].)  Plaintiff "last reported to work on Thursday, May 12, 2016," (ECF No. 47-2, PageID.765), and his February 2017 request (ECF No. 41-9, PageID.551-552) – which the Commissioner construes as his "third request for long-term leave" (ECF No. 41, PageID.412) – was denied on February 28, 2017 (*id*., PageID.1579).  As the Commissioner posited during oral argument, "seeking . . . ongoing leave without a specific end date" and "continuing to re-up those requests" renders Plaintiff "not qualified for the position because the accommodation . . . sought was not reasonable under the circumstances." (citing *Williams*, 847 F.3d at 394).)  *See Williams*, 847 F.3d at 395 ("Given that Williams had a history of taking leaves, that her condition failed to improve during those

leaves, and that she repeatedly failed to return to work by dates on which her treatment providers had previously estimated that she would be able to return, requiring AT&T to grant further leave as an accommodation would be unreasonable."); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000) ("when . . . an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation."); *Maat v. Cnty. of Ottawa, Michigan*, 657 F. App'x 404, 413 (6th Cir. 2016) ("Because Maat's requested leave was not definite in duration, it could not have been a reasonable accommodation under the law of this circuit.").  As the Commissioner points out, Plaintiff last reported to work at the SSA in May 2016, and, in February 2017, he submitted the first request for leave (SSA-71) at issue in this case.  (ECF No. 41, PageID.412.)  Plaintiff was not removed from federal service until December 19, 2017.  In other words, as discussed at the hearing, Plaintiff had been off work for a year before his LWOP was converted to AWOL and at least 18 months passed between the day Plaintiff last reported to work at the SSA and the date on which the SSA removed him from federal service.  On December 18, 2018 – *i.e.*, one year after his removal – Dr. Kahn opined that Plaintiff was "now able to return to work." (*See* ECF No. 47-3,

PageID.786).  Yet, all the while, Plaintiff was working full-time at a higher-paying job that demanded international travel.[6]

### c.    Can Plaintiff establish the remaining elements of a failure to accommodate claim?

Although it is less than clear how a failure to accommodate claim even fits into this case after Judge Kumar's dismissal of Plaintiff's ADA claim, for purposes of this opinion the Court will assume its applicability to the remaining claim for denial of LWOP, noting that both sides continue to argue the point.  The Commissioner argues that Plaintiff "cannot establish the remaining elements of a failure to accommodate claim."  (ECF No. 41, PageID.413.)  In addition to showing disability and qualification, Plaintiff must show "the agency was aware of his disability," "an accommodation was needed, *i.e.*, a causal relationship existed between the disability and the request for accommodation," and "the agency failed to provide the necessary accommodation."  *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997).

---

[6] Plaintiff relies on *Criado v. IBM Corp.*, 145 F.3d 437, 444-445 (1st Cir. 1998) (*see* ECF No. 47, PageID.694, 710, 713, 723), which is not binding in the Sixth Circuit.  In any case, as the Commissioner points out (*see* ECF No. 48, PageID.805), *Criado* is distinguishable, for various reasons.  In *Criado*, the plaintiff was suffering from a *mental impairment* that became exacerbated, yet was denied additional leave after only a *one month* leave of absence, where some extra leave was "not expected to be prolonged or perpetual. *Criado*, 145 F.3d at 444-445.  The is hardly analogous to the circumstances here.

Preliminarily, to the extent Plaintiff argues that his submission of an "SSA-71 accommodation request" obligated the Commissioner "to engage in the interactive process" set forth in the SSA's "Procedures for Providing Reasonable Accommodation" (ECF No. 47, PageID.708-709), the Court disagrees. Indeed, Plaintiff admitted at oral argument that there is nowhere in this case record where he actually used the word "accommodation" in his dealings with the SSA; rather, he simply requested "leave due to my medical condition." Bazzi's affidavit from the EEO investigation represents that Plaintiff "never submitted a request for reasonable accommodation in writing or orally." (ECF No. 47-1, PageID.728 ¶ 15.) (*See also id*., PageID.733-745 [SSA's reasonable accommodation procedures]; PageID.736 [SSA procedure for requesting a reasonable accommodation].) If so, it would appear the Commissioner was not obligated "to engage in the interactive process under Reasonable Accommodation procedure . . . ." (ECF No. 47, PageID.709.)

As for Plaintiff's argument that he can establish the failure to accommodate elements – while ostensibly asking the Court to ignore its prior ruling dismissing his ADA claim – Plaintiff cites El Amin's EEO affidavit (ECF No. 47, PageID.727), claiming "the denying official was aware Plaintiff was over 40, and potentially that he had a heart disease for which he had taken extended medical leave[.]" (*Id*., PageID.710.) Even so, "the SSA granted Plaintiff FMLA leave,"

which Plaintiff then rejected. (ECF No. 41, PageID.413.) (*See also* ECF No. 41-8, PageID.573-574 [March 31, 2017]; ECF No. 41-9, PageID.575-576 [April 9 and 10, 2017].) "[P]laintiff's refusal to accept available reasonable accommodations precludes h[im] from arguing that other accommodations should also have been provided." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802 (6th Cir. 1996). Plaintiff's refusal forecloses his failure to accommodate claim. (ECF No. 41, PageID.413.) *See also Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App's 734, 739-740 (6th Cir. 2017).

Plaintiff disputes the Commissioner's characterization of these events, contending *the Commissioner* invoked his entitlement to FMLA leave in March 2017 (ECF No. 47-2, PageID.767), the SSA's PPM requires the employee to invoke entitlement to FMLA leave (ECF No. 47-1, PageID.731), the CBA states that employees "have a right to LWOP . . . [w]hen an employee makes a request under the [FMLA]," (ECF No. 47-2, PageID.776 ¶ E), the PPM's FMLA section defers to the CBA (ECF No. 47-1, PageID.729), and Plaintiff's April 2017 letter states, "I do not invoke my entitlement to use LWOP under Family Medical Leave[,]" (ECF No. 47-2, PageID.768). (ECF No. 47, PageID.711.) Plaintiff contends his "attempt to opt for his 'right to LWOP' under FMLA criteria under AFGE Contract . . . [,]" as opposed to allowing the Commissioner "to invoke FMLA against Agency policy[,]" was met by the Commissioner "denying any

right to FMLA under any circumstances," as happened in Bazzi's April 10, 2017 letter (ECF No. 47-2, PageID.769), notwithstanding the CBA's provision that "[l]eave will not be denied as a disciplinary measure[,]" (*id*., PageID.778 ¶ F). (ECF No. 41, PageID.712.)

Yet, Bazzi's April 10, 2017 letter informed Plaintiff that, absent his "invocation of FMLA," there was "no obligation placed upon management to grant LWOP." (ECF No. 41-9, PageID.578.)[7] Assuming *arguendo* that Plaintiff's leave requests are construed as reasonable accommodation requests, the SSA "offered Plaintiff leave that he rejected[.]" (ECF No. 48, PageID.803-805.) *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) ("although an employee is not required to accept an offered accommodation, if an individual rejects a reasonable accommodation, the individual will no longer be considered a qualified individual with a disability.") (citing, in part, *Hankins*, 84 F.3d at 801). Moreover, Plaintiff seemed insistent on LWOP *without FMLA*, which is <u>not</u> a right under the LWOP Policy. That policy expressly states, in pertinent part, that, "There is no entitlement to LWOP except … [u]nder the Family and Medical Leave Act." Defendant did not have to keep giving LWOP without FMLA, but could and did

---

[7] At oral argument, Plaintiff quibbled about the fact that while he did not "invoke" FMLA, he somehow did "request it." (*See, e.g.*, ECF No. 47, PageID.704, 711-712.) Yet, in the Court's view, this is a distinction without an appreciable difference, even recognizing the fact that the two verbs are used in various places in this record.

accommodate by offering FMLA. <u>LWOP in this case was otherwise discretionary</u>. (ECF No. 41-8, PageID.510, 512, 514, 516, 518; *see also* ECF Nos. 1-2, PageID.37 (part of Plaintiff's pleadings) & 47-3, PageID.790 ("In most instances, granting LWOP is a matter of **supervisory discretion** and may be limited by internal policy." (emphasis in original).) As the Commissioner persuasively argued at the hearing, the law does not entitle Plaintiff to receive the specific accommodation that he demands, only that a "reasonable accommodation" be provided. Here, he was offered one and insisted on a discretionary alternative, specifically, one that would afford him the ability to be away from his government job while working full-time elsewhere —admitting in his deposition (when questioned about his age claim) that he was "trying to start a second career" (ECF No. 41-2, PageID.465 [p. 176] — without it counting against his FMLA time. That was not reasonable.

### d. Can Plaintiff establish the remaining elements of disability discrimination?

The Commissioner argues that Plaintiff "cannot establish the remaining elements of disability discrimination." (ECF No. 41, PageID.414-416.) In addition to showing disability and qualification, Plaintiff must show he "suffered an adverse employment decision[,]" "the employer knew or had reason to know of the plaintiff's disability[,]" and "the position remained open while the employer sought other applicants or the disabled individual was replaced." *DiCarlo v.*

*Potter*, 358 F.3d 408, 418 (6th Cir. 2004).  *See also Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (three-step burden-shifting framework).

Arguing that he can establish the disability discrimination elements (ECF No. 47, PageID.712-715), Plaintiff cites, *inter alia*, Bazzi's April 17, 2017 letter about conversion to AWOL (ECF No. 47-2, PageID.771), the December 19, 2017 Decision to Remove from Federal Service (AFGE) (ECF No. 47-2, PageID.773), and June 13, 2018 hearsay from the WCSD that the SSA "does not have a policy that specifically prohibits working on sick leave and does not require employees to request permission before obtaining outside employment."  (ECF No. 47-3, PageID.798), ultimately noting that "an extended medical leave, or an extension of an existing leave period, *may* be a reasonable accommodation if it does not pose an undue hardship on the employer[,]" *Dark v. Curry Cnty.*, 451 F.3d 1078, 1090 (9th Cir. 2006) (quotation and citation omitted) (emphasis added).  (ECF No. 47, PageID.713-714.)

Nonetheless, even if Plaintiff had established a prima facie case of disability discrimination, he has not shown that "the denial of his leave requests was pretext for discrimination."  (ECF No. 48, PageID.806.)  As to the characterization of his medical certification as "vague," Plaintiff cites:

- the February 2017 email exchange amongst SSA officials (*id.*, PageID.750) as evidence that "claiming the medical certification was 'vague'" was "pretext" to "avoid processing a request for Reasonable Accommodation[,]" *i.e.*, the

Commissioner's "real reason to deny medical certification was to engage in a strategy to force Plaintiff to 'go the FMLA route'[;]"

- the EEO's March 2017 hearsay account of an interview of El Amin, who seems to have indicated that Plaintiff's request for leave and medication documentation w[ere] quite vague (*id*., PageID.747) (although the report does not utilize quotation marks to give exact words and is not in transcript form), as evidence that the Commissioner "refused to engage in the interactive process under Reasonable Accommodation procedure . . ." prior to denying Plaintiff's "accommodation request" as "vague[;]"

(ECF No. 47, PageID.708-709.)  However, the record makes clear that "the SSA had a legitimate, nondiscriminatory reason to deny his request for discretionary LWOP and convert his previously granted leave requests to AWOL."  (ECF No. 41, PageID.415.)  Assuming Plaintiff's effective start date with DEUS was May 16, 2016 (s*ee* ECF No. 47-2, PageID.765-766, 770; ECF No. 47-3, PageID.793, 799), he was not "entitled to over a year of leave [from the SSA] without pay," during this outside employment, and, "[w]ithout an approved leave category, Plaintiff was charged AWOL."  (ECF No. 41, PageID.415-416; *see also* ECF No. 48, PageID.806.)  As the Commissioner stated during oral argument, "there is a clear factual basis tethered to the results" here.   Where an employee claims that his disability makes "reporting to work inadvisable" (ECF No. 41-6, PageID.495, 497), and the employer discovers that the Plaintiff is, in fact, working full-time in a seemingly demanding job elsewhere at the time in question, the employer's

34

citation to that outside employment as a reason to convert LWOP to AWOL, or even more severe disciplinary action for behavior unbecoming a federal employee, can hardly be described as a "mere pretext," regardless of whether outside employment is specifically prohibited. Under such circumstances, an employer is logically justified in believing that its employee is "gaming the system."

Moreover, Plaintiff's evidence does not raise an inference of pretext, particularly on this record. And raising a "metaphysical doubt" of pretext in response to a summary judgment motion is not enough. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). And indeed, even if the SSA was *mistaken* about the dishonesty of Plaintiff's outside employment and/or his ability to work, pretext cannot be inferred from a mere mistake, particularly where, as here, Plaintiff has described to the Court the extensive and lengthy investigation that was undertaken by the SSA before reaching its conclusion, including surveillance of him and his family. (*See, e.g.*, ECF No. 47-1, PageID.728, ¶ 16.)[8] *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("[w]hen an employer reasonably and honestly relies on particularized facts in making an

---

[8] Per the Notice of Proposed Removal, "Records obtained by OIG indicate that you have travelled out of state and country for work since you began your employment with Diamond. On multiple occasions, OIG agents observed you leaving your home at 7:00 a.m. and driving a vehicle registered to Diamond. A Detailed Earnings Query shows that you earned $64,181.60 from Diamond in 2016." (ECF No. 41-5, PageID.482.)

employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" (quoting *Clay v. UPS*, 501 F.3d 695, 713 (6th Cir. 2007)). *Smith v. Chrysler Corp*., 155 F.3d 799, 807 (6th Cir. 1998) ("[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."). *See also Lemieux v. Exxon Mobil Corp*., Case No. 17-12339, 2019 U.S. Dist. LEXIS 11664, *14 (E.D. Mich. Jan. 24, 2019) (Cohn, J.) ("Exxon is protected by the 'modified honest belief' rule, which shields employers from liability for factual mistakes that were reasonably relied upon when making the decision to terminate.") (citing *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)). Finally, in his briefing and when specifically asked at oral argument, Plaintiff points to no record evidence of similarly situated employees who – while claiming an inability to work, held outside, full-time employment – were treated differently. In the end, Plaintiff cannot show that his outside employment did not motivate Defendant to act towards him as it did or that this fact was an insufficient reason. Nor can he show that his denial of LWOP was unjustified or pretextual.

### 4.   Was Plaintiff's December 2017 removal from service due to retaliation?

Plaintiff alleges "retaliation" as one type of discriminatory conduct about which he complains (ECF No. 1, PageID.5 ¶ A), more specifically alleging that the retroactive conversion of LWOP to AWOL – which appears to have occurred on April 17, 2017 (*see* ECF No. 47-2, PageID.771) – was "retaliation for prior EEO activities, and filing complaint(s) of discrimination," (*id.*, PageID.10 ¶ 3), such as his April 24, 2017 formal EEOC complaint (*id.*, PageID.14 ¶ 21), although Plaintiff may have intended to reference the prior March 16, 2017 initial interview (*see* ECF No. 41-16, PageID.631-633).  (*See also* ECF No. 1, PageID.16 ¶ 29; ECF No. 1-3, PageID.46.)  During the hearing, Plaintiff assumed the SSA was informed "towards the end of March" that he had sought informal counseling.  In any event, Plaintiff alleges that the "EEOC Decisions are mute on issues of Retaliation."  (*Id.*, PageID.17 ¶ 38.)

The Commissioner argues that Plaintiff "cannot establish that his removal was retaliation for his prior EEO activity."  (ECF No. 41, PageID.416-417.)  "A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

37

The Commissioner specifically focuses on the fourth element, arguing that "Plaintiff cannot establish that his EEO activity and termination were causally connected."  (ECF No. 41, PageID.416.)  In his response, Plaintiff argues he "can establish that [his] removal was retaliatory[,]" (ECF No. 47, PageID.715-717), expressly citing:

- The December 19, 2017 notice, which explained that Plaintiff was removed for failure "to obtain approved leave status for the majority of [his] continued leave of absence from May 13, 2016 to the present, resulting in charges of AWOL and for conduct unbecoming of a federal employee[,]" (ECF No. 47-1, PageID.746);

- Plaintiff's time and attendance (T&A) summary for the pay period November 27, 2016 to December 10, 2016, which remarks that "[a]ll prior leave requested and approved was granted with the understanding that [he] was unable to return to duty based on a serious medical condition[,]" (ECF No. 47-2, PageID.764);

- The March 29, 2017 email exchange between Bazzi and Cisneros (ECF No. 47-2, PageID.758), as evidence that the Commissioner "clearly validated the authenticity of the medical certification submitted by Dr[.] Khan . . . prior to taking an adverse action[;]"

- McCrary's February 23, 2017 email to El Amin, which states, *inter alia*, "we want to deny the LWOP request from James Luca and require him to go the FMLA route[,]" (ECF No. 47-1, PageID.750); and,

- Bazzi's February 28, 2017 letter, informing Plaintiff, *inter alia*, that "AWOL may be charged unless some other form of leave is requested and approved[,]" (ECF No. 47-1, PageID.754).

(ECF No. 47, PageID.716.)  *See also* 42 U.S.C. § 12203(b) ("Interference, coercion, or intimidation").

Upon consideration, the Commissioner is entitled to summary judgment on Plaintiff's claim that his removal from service was due to retaliation.  "Temporal proximity alone generally is not sufficient to establish causation."  *Kenney v. Aspen Techs.*, *Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).  While Plaintiff filed his EEO complaint in April 2017 (ECF No. 41-17), McCrary, Bazzi, and El Amin provided affidavits in June 2017 and July 2017 (ECF No. 41-18), and Plaintiff was removed in December 2017 (ECF No. 41-12), the months-long time lapse "between when the employer learns of a protected activity and the subsequent adverse employment action" warrants "other evidence of retaliatory conduct to establish causality."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  Plaintiff's testimony – "And I believe that these were motivated by retaliation on the activities I have with EEO and in the office[,]" (ECF No. 41-2, PageID.464 [p. 170]) – is speculative.  (ECF No. 41, PageID.417.)  *See Bryant v. Com. of Ky.*, 490 F.2d 1273, 1275 (6th Cir. 1974) ("[W]here the movant brings forward and supports his motion for summary judgment, his opponent may not rest merely upon his pleadings but rather must come forward to show genuine issues of fact.  Mere conclusory and unsupported allegations, rooted in speculation, do not meet that burden.").  It is not enough that he "believes" one thing caused another;

he must be able to prove it with some material, admissible evidence, beyond the mere sequence of events or passage of time.

Plaintiff's response – namely, if it were not for his "opposition to Defendant's unlawful employment practice[s] . . . ," then he would not have "suffered the adverse employment action of AWOL," "incurred unlawful debt to the Defendant as a result of AWOL," or "have been removed from Federal service on [a] charge of AWOL[,]" (ECF No. 47, PageID.717) – is completely conclusory and, again, speculative. Indeed, although "a reasonable accommodation request is considered protected activity for purposes of a retaliation claim under the Rehabilitation Act," Plaintiff's leave request "was not treated as such," (ECF No. 48, PageID.806), as McCrary's and Bazzi's EEO affidavits show that they did not perceive Plaintiff as having requested a reasonable accommodation (*see* ECF No. 41-18, PageID.650 ¶ 15, 656 ¶ 15). And, even if the Court considered Plaintiff's February 2017 leave request to be protected activity, Plaintiff "cannot rely [solely] on temporal proximity to establish causation[,]" and he "has not alleged facts that would permit the court to infer a causal connection" between Plaintiff's February 2017 leave request and the Commissioner's December 2017 removal decision (or even its September 2017 "proposed removal"). (ECF No. 48, PageID.806-807.) *See Tuttle v. Metro. Gov't*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that

temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.").

Finally, even if Plaintiff could establish a prima facie case of retaliation, he has not shown that "his removal was pretext for discrimination." (ECF No. 41, PageID.417.) Notwithstanding Plaintiff's November 16, 2017 intervening opposition (*see* ECF No. 41-11, PageID.581, 583), Bazzi's September 21, 2017 Notice of Proposed Removal (AFGE) and McCrary's December 19, 2017 Decision to Remove from Federal Service (AFGE) each notify Plaintiff that: (a) as to the charge of AWOL, he "failed to obtain approved leave status for the majority of [his] continued leave of absence from May 13, 2016 to the present, resulting in charges of AWOL[;]" and, (b) as to the charge of conduct unbecoming a federal employee, he "engaged in full-time, outside employment for over a year while telling management that [he] w[as] unable to perform [his] job at SSA due to a serious cardiac impairment." (ECF No. 41-5, PageID.477, 485; ECF No. 41-12, PageID.593, 597.) Notably, these memoranda also mention PPM Section 630.6.5.3.4 / 630.5.3.4, which lists engagement in "private or commercial work providing no value to SSA" as an example of "inappropriate usage" of LWOP. (*Id*., PageID.483-484, 593, 595; ECF No. 41-8, PageID.519.) Plaintiff's retaliation claim does not withstand scrutiny under Rule 56 standards.

### 4.    ADEA (29 U.S.C. §§ 621-634)

Again, assuming that such a claim is still alive in the aftermath of Judge

Kumar's dismissal order (ECF No. 38), the Commissioner argues that Plaintiff

"cannot establish his age discrimination claim."  (ECF No. 41, PageID.418.)  "It

shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's age[.]"  29 U.S.C. § 623(a)(1).  "To set forth a *prima facie* case of age

discrimination using circumstantial evidence, a plaintiff must establish the four

elements of the well-known *McDonnell Douglas* test: 1) that he was a member of a

protected class; 2) that he was discharged; 3) that he was qualified for the position

held; and 4) that he was replaced by someone outside of the protected class."

*Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009).  *See also Braithwaite v.*

*Dep't of Homeland Sec.*, 473 F. App'x 405, 410 (6th Cir. 2012).  At oral argument,

Plaintiff identified disparate treatment as his ADEA theory.

The Commissioner is entitled to summary judgment on Plaintiff's ADEA

claim, if such a claim was or is still extant.  In this regard, Plaintiff responds with

citations to:

- A fragment of a document, perhaps from the EEO investigation, which represents that Plaintiff's "leave request was not granted because of his age, . . . disability status . . . and prior EEO history[,]" yet also states that, "Complainant was not treated

any differently than any other SSA employee" and that, "There are other forms of leave available to Complainant, including …." (ECF No. 47-1, PageID.728 ¶ 16);

- The December 19, 2017 Decision to Remove from Federal Service (AFGE), in which McCrary opined that Plaintiff "w[as] not reporting to [his] CSR job . . . because [he was] engaging in outside work which was more profitable . . . , not because [he was] physically unable to perform [his] CSR duties[,]" (ECF No. 41-12, PageID.592-594; ECF No. 47-2, PageID.773-774)[9]; and,

- A 2023 salary table (ECF No. 47-3, PageID.789).

(ECF No. 47, PageID.717-718.) Plaintiff contends the Commissioner "specifically uses salary as rationale to justify" the removal decision. (*Id*., PageID.718.) Moreover, Plaintiff argues that the Commissioner's stance – "it is against OPM rules for federal employee[s] to engage in outside employment for compensation" – raises a disparate *impact* claim. (*Id*.) Leaving aside his statement at oral argument that he is proceeding under a disparate *treatment* theory, it is unclear how. *See also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' . . . Proof of discriminatory motive . . . is not required under a disparate-impact theory.").

---

[9] At oral argument, Plaintiff verified that he made substantially more money working for DEUS than he was making at SSA.

In any case, Plaintiff must show evidence of a discriminatory motive. He has not. Specifically, he has not shown that "the SSA's legitimate nondiscriminatory reason for denying his leave requests w[as] pretextual[,]" and "his claims of age discrimination are otherwise unsupported[.]" (ECF No. 41, PageID.418.) Indeed, at Plaintiff's deposition, when asked "what action or conduct" Plaintiff believed "was discriminatory with respect to the denial of these leave requests based on your age[,]" Plaintiff stated, *inter alia*: "But the fact that I'm a[n] old guy, *I'm trying to start a second career*, they have absolutely no compassion and no – like, hey, you know, basically *just the way they made me feel*, I *felt* that was based on my age[,]" (ECF No. 41-2, PageID.465 [pp. 175-176] (emphases added)). (ECF No. 41, PageID.418.) Plaintiff "offers the bare speculation that the SSA had an employment practice to remove federal employees who engaged in outside employment." (ECF No. 48, PageID.807.) This is not enough.

## E.    Waiver and Conclusion

Finally, to the extent Plaintiff includes "harassment" and "interference" in his list of points he claims to have "proven" (*see* ECF No. 47, PageID.719), the Commissioner accurately observes that Plaintiff "offers just speculation as support[,]" (ECF No. 48, PageID.807), and, to the extent Plaintiff provides a conclusion (ECF No. 47, PageID.720-723), it will not be treated as separate

argument. Undeveloped arguments are deemed waived. *See*, *e.g.*, *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003); *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997). Plaintiff is unable to prove through admissible evidence that his denial of LWOP or the retroactive conversion of his LWOP to AWOL was improper in the context of this record, or that his removal from government service was discriminatory. The record also fails to support a triable issue of retaliation.

**F.     Order**

For the reasons stated in detail above, the Commissioner's motion for summary judgment (ECF No. 41) is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  September 27, 2024

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE